# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

RANDY HOLSCHER, as Trustee for the
next-of-kin of Joshua Jon Holscher, and
DEBRA KICKHAFER, as Trustee for the
next-of-kin of Joshua Jon Holscher,

       Plaintiffs,


v.                             **MEMORANDUM OF LAW & ORDER**
                                        Civil File No. 11-1458 (MJD/LIB)

MILLE LACS COUNTY,

       Defendant.

Richard W. Curott, Curott & Associates, LLC, Counsel for Plaintiff Randy Holscher.

Brandon E. Vaughn and Vincent J. Moccio, Robins Kaplan Miller & Ciresi, LLP, Counsel for Plaintiff Debra Kickhafer.

Amanda L. Stubson, Jason M. Hiveley, and Jon K. Iverson, Iverson Reuvers, LLC, Counsel for Defendant.


## I.  INTRODUCTION

This matter is before the Court on Defendant's Motion for Summary

Judgment.  [Docket No. 24]  The Court heard oral argument on November 30,

2012.

## II.    BACKGROUND

### A.    Factual Background

#### 1.    Deputy Lawler's Visit to Cari Johnson's House

On the morning of December 3, 2010, Mille Lacs County Sheriff Deputy

Mitch Lawler responded to a domestic disturbance call at the home of Cari

Johnson, the ex-girlfriend of Decedent Joshua Holscher.  (Lawler Dep. 15-16;

Johnson Dep. 5-6.)  Johnson told Lawler that she had argued with Holscher

earlier that morning, he was gone, and that when they had recently broken up, a

few days or weeks ago, he had made suicidal comments to her.  (Lawler Dep. 17-

18, 30, 32.)  She stated that a week or so earlier she had seen Holscher sitting next

to, but not holding, a gun and stating that he wanted to kill himself.  (Johnson

Dep. 19-20.)   She also told Lawler that Holscher had been out hunting deer at

night from his truck with a muzzle loader.  (Lawler Dep. 27.)

#### 2.    Holscher's Arrest

Shortly after noon on the same day, a hunter stopped by the office of

Minnesota Department of Natural Resources employee Stephen Piepgras a

wildlife manager for the Mille Lacs Wildlife Management Area ("WMA"), and

told Piepgras that there was a vehicle in a ditch.  (Piepgras Dep. 6, 11.)  Piepgras

drove over to the spot to assist and saw a truck in a ditch, with Holscher sitting

in the driver's seat.  (<u>Id.</u> 11-12.)  Piepgras approached the truck and noticed that the radio was blaring.  (<u>Id.</u> 12.)  He greeted Holscher and asked how it was going, but Holscher did not acknowledge Piepgras's presence and continued to face forward and look downward.  (<u>Id.</u>)  Piepgras then saw Holscher reaching for something near the center console of the vehicle.  (<u>Id.</u> 12-13.)  He also noticed what appeared to be a bullet hole in the windshield.  (<u>Id.</u> 13.)  Piepgras became concerned for his safety, so he got back in his vehicle and drove away to call the Mille Lacs County Sheriff's dispatch.  (<u>Id.</u> 13, 17.)  He told dispatch about Holscher's strange behavior, and they told him that they were looking for him on another matter and would send out deputies. (<u>Id.</u>)

About five minutes later, Lawler and a Minnesota State Trooper arrived at the scene and talked to Piepgras.  (Piepgras Dep. 13; Lawler Dep. 21.)  Lawler knew that the vehicle belonged to Holscher and that this was the individual involved in the domestic disturbance call from earlier that day.  (Lawler Dep. 25.)  Lawler and the trooper parked their vehicles approximately 100 to 150 feet away and ordered Holscher to exit the vehicle; he ignored them.  (Lawler Dep. 24-26.)  Because Lawler knew that Holscher had recently been hunting from his truck, he was concerned that Holscher might be armed, so he asked dispatch for more

assistance.  (Lawler Dep. 26-27.)  Multiple other officers responded to the scene, including Mille Lacs County Sheriff's Deputies John Sammis and Todd Hass; Mille Lacs County Sheriff's Investigators Don Lorge, Brad Barnes, and Allen Tutland; and Mille Lacs Tribal Police Officers Robert Wall, Michael Dieter, and Joshua Kimball.  (Mille Lacs County Sheriff's Office Incident Report 10010213.) Lawler told Kimball, Tutland, Lorge, Barnes, Wall, and Dieter that Johnson had told him that Holscher had been suicidal in the past.  (Lawler Dep. 31-32.) However, some officers, such as Sammis, were not aware that Johnson had told Lawler that Holscher had recently been suicidal.  (Sammis Dep. 24-25; Lawler Dep. 28.)

Once Investigators Lorge, Barnes, and Tutland arrived on the scene, they took over.  (Lawler Dep. 36.)  For more than one and a half hours, Lorge used a loud speaker to attempt to persuade Holscher to exit the truck.  (Id. 37.) Eventually, the officers charged the truck, broke the driver's window, pulled Holscher from the truck, and handcuffed him.  (Id. 41.)

Holscher was cold, appeared intoxicated, and had minor cuts on his hands from the glass shards.  (Lawler Dep. 42-43.)  Officers discovered empty prescription pill bottles with Holscher's name on them in his vehicle.  (Id. 44.)

The officers were concerned that Holscher might have overdosed on prescription pills, so they had an ambulance transport him to the hospital for an evaluation. (Id. 44.) Barnes accompanied Holscher in the ambulance and asked him about the empty pill bottles. (Barnes Dep. 38, 42-43.) Holscher denied taking extra pills to Barnes and repeated that denial to Sammis at the hospital. (Id.; Sammis Dep. 49-50.)

### 3.     Examination of Holscher at the Hospital

Once Holscher arrived at the hospital, he was examined and monitored. (Mille Lacs Health System, Emergency Department Report.) Officers did not request a suicide evaluation at the hospital. (Lawler Dep. 45.) Holscher's grandmother, aunt, and sister were at the hospital during the evaluation. (Kickhafer Dep. 24.) Holscher's mother, Debra Kickhafer, testified that they told a doctor at the hospital that they were concerned that Holscher would commit suicide. (Id.) When the hospital staff asked Holscher, he denied having suicidal thoughts and denied having overdosed on his medications. (Emergency Department Report at 1.)

The hospital tested Holscher's blood for the presence of drugs and alcohol. (Emergency Department Report at 2.) Holscher had no alcohol in his system and

the hospital opined that he had not taken an excess quantity of any prescription drugs.  (Id.; Lawler Dep. 48.)  The hospital discharged Holscher to police custody in stable condition.  (Emergency Department Report at 2.)  The hospital did not perform a mental health or suicide evaluation.  Based on the hospital staff's evaluation, the officers decided to transport Holscher to jail.  (Lawler Dep. 55.)  Holscher's discharge form included instructions to watch for symptoms such as nausea and vomiting or changes in mental status; it stated "P[atient] is medically cleared to go to jail."  (Physician Order Sheet – Discharge.)

While the hospital was evaluating Holscher, Holscher's brother, Christopher Holscher, approached Sheriff Brent Lindgren at a convenience store.  (Lindgren Dep. 27.)  Christopher Holscher gave Lindgren a cell phone and Lindgren talked with Holscher's mother.  (Lindgren Dep. 27-28; Kickhafer Dep. 20.)  Kickhafer told Lindgren that Holscher had suffered a traumatic head injury years before and had not been quite right ever since.  (Lindgren 28-29; Kickhafer Dep. 20.)  Lindgren then informed Barnes, who was at the hospital with Holscher, of the prior head injury.  (Lindgren Dep. 29-30.)

Holscher's mother also spoke by phone to an unknown sheriff's deputy who was at the hospital during Holscher's evaluation.  (Kickhafer Dep. 21-22.)

She told him that Holscher had attempted suicide six or seven years ago and she believed that he would do it again.  (Id. 22.)  Holscher's mother also called various Mille Lacs County agencies and employees, including the Department of Corrections.  (Sammis Dep. 53-55.)

Once Holscher was discharged from the hospital, Lawler and Sammis took custody of him; Holscher violently resisted arrest; Lawler used a Taser on him three times; and they finally subdued him enough to escort him to Sammis' patrol car.  Sammis then took Holscher to the Mille Lacs County Jail ("Jail"), and Lawler went home.  (Lawler Dep. 59-67; Sammis Dep. 60-65.)

### 4.      Booking at the Mille Lacs County Jail

Sammis and Holscher arrived at the Jail around 8:00 p.m. on December 3, 2010.  (Sammis Dep. 63, 67.)  Jail staff assisted Sammis in escorting Holscher into the booking area.  (Id.)  There, Jail staff took custody of Holscher, and the booking officer on duty, Correctional Officer Jason Heacock, conducted a pat down.  (Id. 68; Heacock Dep. 36.)

Following standard Jail procedure, Sammis completed a pre-booking form on a computer in the booking area.  (Sammis Dep. 68, 75.)  In response to the form's question: "Are you aware of any acute medical condition or injury

recently sustained by this arrestee that may require immediate medical attention?" Sammis wrote "overdose medication. taken to the hospital and released." (Intake Questions.) In response to the question "Do you have any other information that may assist this agency in the care and/or custody of this arrestee?" Sammis wrote "previous head injury." (Id.) In response to the question "Has this arrestee demonstrated any behaviors that might suggest suicidal tendencies?" Sammis responded, "No." (Id.) Sammis testified that his response was based on his own observation of Holscher at the scene and at the hospital and on the fact that he had no other information suggesting that Holscher was suicidal. (Sammis Dep. 76-78.) No one had told Sammis that Holscher had a history of suicidal threats. (Id. 24-26.) Sammis testified that if had known what the other officers at the scene of the arrest knew, then he "[p]robably" would have checked the box on the booking sheet stated "that he was suicidal." (Id. 86-87.)

Meanwhile, Heacock completed booking Holscher. (Heacock Dep. 36.) No one told Heacock that there was any concern that Holscher was possibly suicidal. (Id.) Heacock went over a medical questionnaire with 37 questions with Holscher. (Id. 38; Medical Questions at 2.) Heacock asked Holscher if he

felt suicidal, and Holscher stated "no."  (Heacock Dep. 40; Medical Questions at

2.)  Heacock asked Holscher if he had ever tried to harm or kill himself, and

Holscher responded "no."  (Heacock Dep. 40; Medical Questions at 2.)  Heacock

noted that Holscher had attention deficit hyperactivity disorder ("ADHD"),

anxiety, and depression and had been treated for those conditions.  (Heacock

Dep. 38, 40; Medical Questions at 2.)

Heacock also conducted a brief mental health screening on Holscher.

(Heacock Dep. 41-43; Brief Jail Mental Health Screen.)  Because Holscher stated

that he was taking prescription medication for an emotional or mental health

problem and had been in a hospital for depression, ADHD, and anxiety, Heacock

checked the box to request further evaluation by the Jail nurse.  (Heacock Dep.

43; Brief Jail Mental Health Screen.)

Heacock contacted the on-call Jail nurse for medical verification to

determine whether Holscher could continue to be given the prescriptions that he

came to jail with, but Heacock did not ask for a mental health or suicide

evaluation.  (Heacock Dep. 45-48.)

After booking, Heacock placed Holscher in a holding cell, Holding Cell 2

("HC-2").  (Heacock Dep. 75.)  He did not put Holscher on suicide watch or

request a suicide evaluation.  The Jail kept Holscher in the holding cell until

December 5, 2010, and the staff conducted well-being checks on him on a

frequent basis.  (Id. 75; Booking Log.)

At 9:40 p.m. on December 3, Holscher's mother called the Jail.  She asked

the Jail administrator to watch her son because "he was not normal," and "there

was something wrong with him."  (Kickhafer Dep. 29.)  She told the Jail

employee that she was worried about Holscher's brain injury and his depression.

(Id. 32.)  She does not recall whether she used the word "suicide" in her

discussion.  (Id. 32-33.)

### 5. Holscher's Placement in the Jail Housing Unit and Suicide

On December 5, 2010, at 1:38 a.m., Jail staff escorted Holscher from the

holding cell to the G-Block housing unit, in the Med/Max housing unit.  (Booking

Log at Mille Lacs 22636; Med/Max Log.)  Correctional Officer Brandon Hoeft was

assigned to G-Block on December 5 and 6, 2010.  (Hoeft Dep. 7.)  Hoeft regarded

Holscher as a "typical inmate."  (Hoeft Dep. 13, 17.)  Hoeft did not have any

special information about Holscher and did not observe anything that made him

appear suicidal.  (Id. 14, 29-30.)

At 8:30 a.m. on December 6, Barnes interviewed Holscher regarding his arrest. (Barnes Dep. 55-56.) Holscher told Barnes that he had consumed 90 prescription pills while sitting in his truck on the day of his arrest. (Barnes Dep. 56.) Barnes shared this information with Mille Lacs County Attorney's Office attorney Tara Lopez. (Lopez Dep. 13.)

At 9:18 a.m. that day, Kickhafer contacted the Mille Lacs County Attorney's Office and told them that she needed help getting her son to a hospital because he was not himself, had a traumatic brain injury, and needed to get to a psychiatric hospital and be evaluated because she was afraid he would die in jail. (Kickhafer Dep. 28; Kickhafer Telephone Log.) Lopez was aware that Kickhafer called the office with concern about Holscher because he had a traumatic head injury. (Lopez Dep. 6.)

The morning of December 6, Holscher appeared in court, and Lopez told the judge that there were significant concerns about Holscher, including his emotional wellbeing. (Lopez Dep. 17-18.) Lopez advised the court about Holscher's possible ingestion of 90 pills "because that would indicate that he had tried to potentially harm himself." (Lopez Dep. 15, 17, 26-27.) Lopez did not

oppose a medical furlough for Holscher to have his emotional wellbeing evaluated.  (Id. 31.)

Holscher visited the Jail nurse, Michelle Wollak, on the afternoon of December 6 and again on December 7, 2010, for evaluation due to medication withdrawal and his mother's concerns about his previous head injury.  (Wollak Dep. 40, 45, 68; Medical Staff Narrative Note; Health Screening Tool.)  Wollak was not asked to, and did not, complete a suicide assessment or mental health evaluation.  (Wollak Dep. 45.)  On both days, Holscher denied having suicidal thoughts, but stated that he was down and depressed.  (Id. 46-47, 54, 68; Medical Staff Narrative Note; Health Screening Tool.)  Based on her interactions with him, Wollak did not believe that he was suicidal or a danger to himself.  (Wollak Dep. 68-69.)

Correctional Officer Deborah Hoffman came on shift on G-Block at 6:00 a.m. on December 7.  (Hoffman Dep. 9.)  Hoffman conducted periodic well-being checks on Holscher and did not note anything out of the ordinary.  (Id. 23-24, 29-30, 41-46, 62-65, 68-69, 71.)

At approximately 1:45 p.m., on December 7, Correctional Officer William Kalton relieved Hoffman; Kalton did not recall receiving any information about

Holscher at the start of his shift.  (Kalton Dep. 44-45.)  He does not remember if he had any interaction with Holscher during his shift.  (Id. 41-42.)

At 5:55 p.m. on December 7, Correctional Officer Bradley Oslin replaced Kalton.  (Oslin Dep. 9.)  Oslin conducted his first well-being check on Holscher at 6:10 p.m. and saw Holscher standing in his cell, looking out the cell door window.  (Id. 9, 15-16.)

At 6:30 p.m. on December 7, Oslin found Holscher hanging in his cell by a sheet tied around his neck and connected to a grate located above the cell's toilet and sink.  (Oslin Dep. 35-36.)  Oslin called a Code Blue (medical emergency), entered the cell and held up Holscher by the legs until, a short time later, other Jail staff arrived and took Holscher down. (Id. 35-37.)  Jail staff performed CPR on Holscher.  (Id. 37-39.)  Paramedics arrived, stabilized Holscher's vitals, and then transported him to the hospital.  (Jail Incident Report at 5-10.)  He had a pulse when he left the Jail.  (Id. 5-10.)  Holscher died at 8:55 p.m. on December 10 at the hospital due to brain damage from lack of oxygen from suicide. (Hennepin County Medical Examiner – Cause of Death Hierarchy Report.)

After Holscher's suicide, the Jail conducted an internal review of the Jail records and decided that Jail staff had followed the Jail's policies and procedures.

(Smith Dep. 6-8.)  The Minnesota Department of Corrections conducted its own

review of the incident and concluded that the Jail staff did not violate any

provisions of Minnesota Rules Chapter 2911 governing jail facilities.  (June 3,

2011 Letter from Timothy G. Thompson to Sheriff Brent Lindgren.)

### 6.    Jail Policies and Training

#### a)    Jail Suicide Prevention Policy

At the time of Holscher's suicide, the Jail had a Suicide Prevention Policy

("Policy).  (Suicide Prevention Policy, No. 4.5.12.)  The Policy states that the Jail

"trains facility staff to recognize and supervise suicidal prone inmates in order to

promote a healthy and safe environment for staff and inmates."  (<u>Id.</u> at 1.)

 Pursuant to the Policy, the booking officer must complete a medical

screening form, which includes questions pertaining to suicide.  (<u>Id.</u> at 1.)  The

booking officer forwards the complete form to the health care staff.  (<u>Id.</u>)  Also,

correctional officers are required to be trained in recognizing possible indicators

of suicidal ideation such as intense anxiety, extreme depression, history of past

suicide attempts, and present or past threats to attempt suicide.  (<u>Id.</u> at 1-2.)  If a

correctional officer sees indicators of risk of suicide, the detainee or inmate is

placed in Holding Cell 1 ("HC-1") or Holding Cell 2 ("HC-2") for close

monitoring by Jail staff.  (Id. 2.)  These cells do not have a wire grate accessible to inmates that could be used for hanging.  (Heacock Dep. 55.)

Before being placed in a holding cell, the detainee or inmate must be pat-searched, placed in a suicide smock, and given a suicide blanket.  (Policy at 2-3.)  Potentially harmful items must be removed from the holding cell and the detainee or inmate's person.  (Id.)

Plaintiffs' expert, Alvin W. Cohn, opines "that the jail's policy and procedure regarding suicide and prevention is appropriate and one that easily could have been, but in my opinion was not, followed by jail personnel."  (Cohn Report at 6.)  Defendant's jail consultant expert, David T. Prachar, similarly concludes that the Policy met acceptable and usual jail practices.  (Prachar Report at 12.)

### b)   Jail Training on Suicide Prevention

The Jail provides annual training on suicide prevention for its staff.  (Brown Dep. 29-31.)   The training teaches correctional officers how to recognize warning signs of suicide risk and how to implement procedures outlined in the Policy.  (Brown Dep. 30-31.)  All officers who had contact with Holscher or who

were assigned to G-Block had attended a refresher course on suicide prevention in 2010.  (Brown Aff. ¶ 3.)

### 7.    Previous Suicide Attempts and Suicides at the Jail

Between 2002 and 2010, there were seven attempted suicides and two suicides committed in the Jail by inmates, including Holscher.  (Defendant's Amended Answers to Plaintiffs' Third Set of Interrogatories.)  Five of the inmates who attempted suicide had documented mental illnesses.  One of those five self-reported suicidal ideation and was placed on a medical hold and given a mental health evaluation.  Four of the five denied suicidal ideations and, despite other potential red flags such as histories of depression, past suicidal thoughts, past suicide attempts, and/or hearing voices telling them to self-injure, no suicide evaluations or suicide watches were ordered.

The other inmate, besides Holscher, who committed suicide in the Jail during the relevant time frame also committed suicide by hanging himself from a sheet tied to a grate in his cell in G Block, less than one year before Holscher did the same thing.  Like Holscher, that inmate identified his mental illness during booking but denied suicidal ideations.  Although the Jail learned that this

inmate had previously threatened to commit suicide, no suicide evaluation or suicide watch was ordered.

### B.      Procedural History

Plaintiffs Randy Holscher and Debra Kickhafer, as trustees for the next-of-kin of Holscher, sued Defendant Mille Lacs County ("County") in Minnesota State Court, Mille Lacs County.  The County removed the case to this Court on June 3, 2011.

The Amended Complaint alleges Count 1: Denial of Due Process Right to Adequate Medical Care under 42 U.S.C. § 1983 based on the Fourteenth Amendment of the U.S. Constitution and under Article 1 § 5 of the Minnesota Constitution; Count 2: Denial of Due Process Right to Life, under 42 U.S.C. § 1983 based on the Fourteenth Amendment of the U.S. Constitution and under Article 1 § 7 of the Minnesota Constitution; Count 3: Failure to Train, under 42 U.S.C. § 1983 based on the Fourteenth Amendment of the U.S. Constitution and under Article 1 §§ 5, 7 of the Minnesota Constitution; and Count 4: Negligence and Wrongful Death, under Minnesota's Wrongful Death Act, Minnesota Statute § 573.02.

Defendant now brings a motion for summary judgment on all claims against it.

## III.    DISCUSSION

### A.    Summary Judgment Standard

Summary judgment is appropriate if, viewing all facts in the light most favorable to the non-moving party, there is no genuine dispute as to any material fact, and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23 (1986).  The party seeking summary judgment bears the burden of showing that there is no disputed issue of material fact.  <u>Celotex</u>, 477 U.S. at 323.  "A dispute is genuine if the evidence is such that it could cause a reasonable jury to return a verdict for either party; a fact is material if its resolution affects the outcome of the case."  <u>Amini v. City of Minneapolis</u>, 643 F.3d 1068, 1074 (8th Cir. 2011) (citing <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248, 252 (1986)).

### B.    Claims Based on Violation of the Minnesota Constitution

Plaintiffs concede that there is no private right of action for compensation or damages under the Minnesota Constitution for violation of the rights guaranteed under the Minnesota Constitution. (Plaintiffs' Opposition at 18.)  <u>See, e.g.</u>, <u>Mlnarik v. City of Minnetrista</u>, No. A09-910, 2010 WL 346402, at *1 (Minn. Ct. App. Feb. 2, 2010).  Thus, they agree to the Court's dismissal of the Minnesota Constitutional portions of Counts 1, 2, and 3.

18

**C.     Negligence under Minnesota's Wrongful Death Act (Count 4)**

Plaintiffs concede that vicarious official immunity protects the County

from liability for Plaintiffs' state law negligence claim.  (Plaintiffs' Opposition at

34.)  Thus, the Court grants summary judgment on Count 4.

**D.     Substantive Due Process (Count 2)**

Plaintiffs admit that discovery has not produced evidence to support a

finding of a violation of Holscher's substantive due process right.  (Opposition

Brief at 34.)  Thus, the Court grants summary judgment on Count 2.

**E.     Right to Adequate Medical Care (Count 1)**

**1.     Deliberate Indifference Standard**

When bringing a § 1983 claim a plaintiff must establish (1) that he was

deprived of a right secured by the Constitution or laws of the United States and

(2) that the deprivation was committed under color of state law.  <u>Lugar v.</u>

<u>Edmondson Oil Co.</u>, 457 U.S. 922, 931 (1982).  Section 1983 "is not itself a source

of substantive rights, but merely provides a method for vindicating federal rights

elsewhere conferred."  <u>Graham v. Connor</u>, 490 U.S. 386, 393-94 (1989) (citation

omitted).

> [T]he Eighth Amendment prohibition on cruel and unusual
> punishment extends to protect prisoners from deliberate
> indifference to serious medical needs.  [A] risk of suicide by an
> inmate is a serious medical need.  Because [the plaintiff] was a

pretrial detainee, [his] claims are analyzed under the Fourteenth Amendment's Due Process Clause rather than the Eighth Amendment. Under the Fourteenth Amendment, pretrial detainees are entitled to at least as great protection as that afforded convicted prisoners under the Eighth Amendment. In short, [the plaintiff] had a clearly established constitutional right to be protected from the known risks of suicide and to have his serious medical needs attended to.

Luckert v. Dodge County, 684 F.3d 808, 817 (8th Cir. 2012) (citations omitted).

[A]n official is deliberately indifferent (reckless) if he disregards a known risk to a prisoner's health. To establish a constitutional violation, it is not enough that a reasonable official should have known of the risk, a plaintiff must establish that the official in question did in fact know of the risk. However, this knowledge is subject to proof by all the usual ways, including inferences based on the obviousness of the risk. Lastly, even if an official knows of a risk, he is not liable for a subsequent injury if he responded reasonably to the known risk.

Gregoire v. Class, 236 F.3d 413, 417 (8th Cir. 2000) (citations omitted). The plaintiff "need not show that a prison official acted or failed to act believing that harm actually would befall an inmate; it is enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm." Farmer v. Brennan, 511 U.S. 825, 842 (1994).

In a deprivation of medical care case, the inmate must show (1) an objectively serious medical need; and (2) the defendants actually knew of the medical need but were deliberately indifferent to it.

An objectively serious medical need is one that either has been diagnosed by a physician as requiring treatment, or is so obvious that even a layperson would easily recognize the necessity for a doctor's attention. . . . If prison officials have actual knowledge of a serious medical need, and fail to take reasonable measures to address it, they may held liable for deliberate indifference. However, [a] showing of deliberate indifference is greater than gross negligence and requires more than mere disagreement with treatment decisions.

Jones v. Minn. Dept. of Corr., 512 F.3d 478, 481-82 (8th Cir. 2008) (citations

omitted).

## 2.    Claims Against a County: Monell

Plaintiffs have only sued the County; they have not sued any individuals.

"A claim against a county is sustainable only where a constitutional violation has

been committed pursuant to an official custom, policy, or practice." Luckert, 684

F.3d at 820 (citation omitted). The "custom, policy, or practice must be the

moving force behind the violation. Moreover, the plaintiff must show not only

that a policy or custom existed, and that it was causally related to the plaintiff's

injury, but that the policy itself was unconstitutional." Id. (citations omitted).

A municipality or other local government may be liable under [§ 1983] if the governmental body itself subjects a person to a deprivation of rights or causes a person to be subjected to such deprivation. But, under § 1983, local governments are responsible only for their own illegal acts. They are not vicariously liable under § 1983 for their employees' actions.

Connick v. Thompson, 131 S. Ct. 1350, 1359 (2011) (citations omitted).

 (citations omitted).

"[A] 'policy' is an official policy, a deliberate choice of a guiding principle or procedure made by the municipal official who has final authority regarding such matters." Mettler v. Whitledge, 165 F.3d 1197, 1204 (8th Cir. 1999) (citation omitted). In contrast, proof of a custom requires:

> 1) The existence of a continuing, widespread, persistent pattern of unconstitutional misconduct by the governmental entity's employees;
>
> (2) Deliberate indifference to or tacit authorization of such conduct by the governmental entity's policymaking officials after notice to the officials of that misconduct; and
>
> (3) Th[e] plaintiff['s] injur[y] by acts pursuant to the governmental entity's custom, i.e., [proof] that the custom was the moving force behind the constitutional violation.

Id. (citation omitted).

### 3. Custom Alleged

Here, Plaintiffs admit that the Jail's official Policy was constitutional. They assert that the County's liability arises out of an unconstitutional custom. Specifically, Plaintiffs assert that the County had a custom of only treating an inmate as suicidal if he explicitly stated that he was suicidal; if an inmate denied

being suicidal, the County did not treat him as suicidal, regardless of any other indicia of suicidal ideation. In order to survive summary judgment, Plaintiffs must both show that jail employees violated the Constitution with regard to Holscher – i.e., were deliberately indifferent to Holscher's serious medical need – and that this deliberate indifference was part of a larger overall custom by the County.

### 4. Whether the County Had Knowledge of and Was Deliberately Indifferent to Holscher's Risk of Suicide

The Court concludes that Plaintiffs have raised a genuine issue of material fact regarding whether the County had actual knowledge of Holscher's risk of suicide. See Coleman v. Parkman, 349 F.3d 534, 539-40 (8th Cir. 2003) (noting distinction between allegation that jail "should have discovered" that inmate was suicide risk and allegation that jail "did know of the risk"). Viewing the facts in the light most favorable to Plaintiffs, despite the County's knowledge that Holscher was a suicide risk, it did not screen Holscher and placed him in a cell in which he had access to bed sheets and an exposed grate from which to hang himself, as another inmate had done less than a year earlier. Cf. Turney v. Waterbury, 375 F.3d 756, 762 n.3 (8th Cir. 2004) (granting summary judgment for county but noting that the plaintiff did not make the "argument that the county

is deliberately indifferent by thrusting known suicide risks . . . into situations which increase their chances of success, such as a single cell with exposed bars and bed sheets").

A jury could rely on the following evidence, taken together, to find that the County had actual knowledge that Holscher was a suicide risk and that the County was deliberately indifferent to that risk: Johnson's statements to Lawler that Holscher had a gun and stated that he wanted to kill himself, information Lawler passed on to some, but not all, other members of law enforcement; the empty prescription bottles in Holscher's truck and the suspicion that he had overdosed; the failure to request a suicide evaluation from the hospital; Kickhafer's warnings to multiple Mille Lacs County employees that Holscher was depressed, that something was wrong with him, that he had a brain injury, that she was worried about him, that he might die in jail, and that he had attempted suicide in the past and she believed he would do it again; the failure to share information regarding Holscher's mental health with Sammis; Heacock's decision to take Holscher at his word during booking when Holscher said that he did not feel suicidal even though Heacock was aware of Holscher's mental health disorders and medication; the failure to place Holscher on suicide watch; Barnes'

and Lopez's knowledge that Holscher had claimed to have swallowed 90 pills on the day of his arrest; and Cohn's expert opinion that the Jail did not follow its Policy, that Holscher "should have been classified as High Risk," that it is not uncommon for an offender who is considering suicide to deny such thoughts, and that such denials should not be taken at "face value" (Cohn Report at 6, 8.) Given these potential red flags and the Jail's choice to conduct no evaluation of suicide risk and place him in a cell with a grate and sheets, there is a genuine issue of material fact regarding the County's knowledge of his risk of suicide and its deliberate indifference to that risk.

### 5. Evidence of a Pattern at the Jail

In order for Plaintiffs' <u>Monell</u> claim to survive, they must also show that Holscher's death was the result of an unconstitutional custom.

### a) Heacock's Actions During Booking

Heacock testified that he would take an inmate for an immediate mental health evaluation from booking

> Basically if they're actively suicidal, you know, we ask them, "Are you suicidal?" "Yes, I am suicidal." We would then take the suicide precautions and notify the nurse and the jail administration that he was placed on the high-risk watch and taking the precautions with the suicidal tendencies.

(Heacock Dep. 48.)  Heacock also testified that, if someone did not explicitly state

that he was suicidal, in order to be place on high-risk watch would require

> A.    Them actually committing, you know, trying to hurt
>        themselves in any – any shape or form.  It's, you know, they
>        either come out and say, "I feel like I'm going to hurt myself,"
>        or they're actually hurting themselves, then they'd be placed
>        on the 15-minute watch.

> Q.    And those are the only two ways to be designated as high
>        risk?

> A.    Unless it was deemed necessary by somebody higher up in
>        the – by a sergeant.

(Heacock Dep. 49-50.)

Plaintiffs interpret Heacock's testimony to mean that, under Jail custom,

the only way that an inmate could be treated as suicidal at the time of booking

was if he said that he was suicidal or actually tried to hurt himself.  They

conclude that this custom was unconstitutional because "[s]uch denials . . .

should never be accepted by trained staff at face value."  (Cohn Report at 8.)

The County notes other portions of Heacock's testimony where he testified

that, while booking Holscher, he looked for all signs potentially indicating a

suicide risk as outlined in the County's constitutional suicide prevention policy.

(Heacock Dep. 57-59.)  Heacock's testimony is open to interpretation and, when

viewed in the light most favorable to Plaintiffs, supports their claim of an unconstitutional custom.

### b) Previous Suicides and Suicide Attempts at the Jail

Plaintiffs point to further evidence of an unconstitutional custom based on the suicide attempts and suicides at the Jail between 2002 and 2010. They argue that these past attempted suicides and suicides show that the County had a custom of not sending inmates for suicide evaluations or placing them on suicide watch if they denied suicidal thoughts at the time of their bookings regardless of any other indicia of suicide risk. Plaintiffs note that "[i]n some circumstances, one or two suicides may be sufficient to put a sheriff on notice that his suicide prevention training needs revision." Wever v. Lincoln County, Neb., 388 F.3d 601, 608 (8th Cir. 2004).

Between Heacock's testimony and the evidence of the County's treatment of previous inmates who were not treated as suicidal, despite red flags, because they did not self-report suicidal ideations, Plaintiffs have a raised a genuine issue of material fact regarding the existence of an unconstitutional custom, to which the County was deliberately indifferent, and which was the moving force behind

Plaintiffs' injury.  The Court denies summary judgment on the federal portion of Count 1.

### F.  Failure to Train (Count 3)

#### 1.  Failure to Train Standard

"A failure to properly train employees is one way in which an entity can exhibit deliberate indifference toward the rights of others."  <u>Turney</u>, 375 F.3d at 762.

> A city . . . may be liable for deficient policies regarding hiring and training police officers where (1) the city's hiring and training practices are inadequate; (2) the city was deliberately indifferent to the rights of others in adopting them, such that the failure to train reflects a deliberate or conscious choice by a municipality, and (3) an alleged deficiency in the city's hiring or training procedures actually caused the plaintiff's injury.  It is necessary to show that in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need.  In other words, the plaintiff must demonstrate that the city had notice that its procedures were inadequate and likely to result in a violation of constitutional rights.

<u>Andrews v. Fowler</u>, 98 F.3d 1069, 1076 (8th Cir. 1996) (citations omitted).

#### 2.  Discussion of Failure to Train Claim

Plaintiffs assert that the fact that the Jail staff ignored the County's suicide prevention Policy by accepting inmates' denials of suicidal thoughts at face value

demonstrates that Jail employees were not properly trained on how to implement the official Policy or how to recognize suicidal tendencies.  Plaintiffs argue that evidence of the many attempted suicides and the two successful suicides from 2002 until 2010 show that the County knew that its staff were ignoring the Policy.  See Szabla v. City of Brooklyn Park, Minn., 486 F.3d 385, 393 (8th Cir. 2007) ("[T]he need for a particular type of training may be obvious where jailers face clear constitutional duties in recurrent situations.") (quoting Young v. City of Augusta, 59 F.3d 1160, 1172 (11th Cir. 1995)) (emphasis in Szabla); Wever, 388 F.3d at 608 ("In some circumstances, one or two suicides may be sufficient to put a sheriff on notice that his suicide prevention training needs revision.").  Plaintiffs conclude that providing an initial staff training on suicide prevention and then an annual refresher on suicide prevention to staff is clearly not sufficient if the Policy is blatantly ignored.  They assert that this lack of proper training caused Holscher's death.

Viewing the evidence in the light most favorable to Plaintiffs, despite having a valid Policy, the Jail experienced multiple suicide attempts and two successful suicides by persons with suicide red flags who were not referred for further evaluation based solely on their own failure to self-report.  Additionally,

Heacock testified that, despite undergoing the Jail's required training, he would only refer inmates for further evaluation if they self-reported suicidal thoughts. From these facts, a jury could infer that the County's training was inadequate; the County was deliberately indifferent in failing to revise its training; and this inadequate training caused Plaintiffs' injury.

Accordingly, based upon the files, records, and proceedings herein, **IT IS HEREBY ORDERED**:

Defendant's Motion for Summary Judgment [Docket No. 24] is **GRANTED IN PART** and **DENIED IN PART** as follows:

Count 1, Denial of Due Process Right to Adequate Medical Care, **REMAINS** to the extent it is based on 42 U.S.C. § 1983 based on the Fourteenth Amendment of the U.S. Constitution and is **DISMISSED** to the extent it is based on Article 1 § 5 of the Minnesota Constitution;

Count 2: Denial of Due Process Right to Life, under 42 U.S.C. § 1983 based on the Fourteenth Amendment of the U.S. Constitution and under Article 1, § 7 of the Minnesota Constitution is **DISMISSED** in its entirety;

Count 3: Failure to Train, **REMAINS** to the extent it is based on 42 U.S.C. § 1983 based on the Fourteenth Amendment of the U.S. Constitution and is **DISMISSED** to the extent it is based on Article 1, §§ 5, 7 of the Minnesota Constitution; and

Count 4: Negligence and Wrongful Death, under Minnesota's
Wrongful Death Act, Minnesota Statute § 573.02 is
**DISMISSED**.


Dated:   February 11, 2013          s/ Michael J. Davis                           
                                    Michael J. Davis
                                    Chief Judge
                                    United States District Court